# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RANDY JOE DICKERSON, et al., | } | |
| | } | |
| Plaintiffs, | } | |
| | } | |
| v. | } | Case No.: 5:01-CV-3111-RDP |
| | } | |
| CITY OF HUNTSVILLE, et al., | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

### I.     Introduction

Plaintiffs filed this action on or about November 6, 2001, in the Circuit Court of Madison County, Alabama.  (Doc. #1 at Pls.' Compl.)  On December 5, 2001, Defendants removed the case to this court.  (Doc. #1).  On January 18, 2002, Plaintiffs filed an Amended Complaint.  (Doc. #12).

On December 20, 2002, the court[1] entered an Order that bifurcated the claims against Defendant Szamier from the claims against Defendant City of Huntsville (the "City").  (Doc. #30). The court further granted a stay on discovery relating to the City pending the adjudication of the anticipated summary judgment motion against Defendant Szamier.

Pending before the court are a Motion for Summary Judgment (Doc. #33) filed by Defendant Szamier on March 6, 2003, and a Motion for Summary Judgment (Doc. #34) filed by the City on the same date.  For the reasons stated below, the court concludes that both motions are due to be granted.

### II.    Statement of Facts

On July 29, 2000, Kevin Arnold, a pharmacist at Propst Drugs located in Huntsville,

---

[1]On October 1, 2003, the undersigned received this case by reassignment.  (Doc. #41). Orders prior to that date were entered by another judge of this court.

Alabama, contacted the Huntsville Police Department about a suspected prescription forger, who had entered the pharmacy in an effort to illegally obtain a prescription drug. (Dfs.' Ex. F). Arnold provided the dispatcher with a description of the suspect–white male, about six feet tall, reddish brown hair, a beard, a charcoal grey T-shirt, a black hat–and included his name–Douglas Searcy. (Dfs. Ex. F; Dfs. Ex. G).

Defendant Szamier was the sole officer dispatched to the scene. He was given a description of the suspect and was instructed to wait until the pharmacist had given the drugs to Searcy before apprehending him. (Dfs. Ex. G; Dfs. Ex. F).

Plaintiff Randy Dickerson was in Propst Drugs standing in line to pay his phone bill at the BellSouth counter, which is in a section of the store separate from the pharmacy. (Doc. #39 at 2-3). Defendant Szamier observed a female clerk, who he later learned to be Amanda Clarke, look at him. (Doc. #36 at Ex. C at 77, 155-56; Ex. D ¶ 4). Defendant Szamier perceived Ms. Clarke to acknowledge him as he walked toward Plaintiff Dickerson. (Doc. #36 at Ex. C at 77, 155-56; Ex. D ¶ 4). Defendant Szamier approached Plaintiff Dickerson from behind and suddenly gripped his right forearm hard. (Doc. #39 at 4). The force of grip caused Plaintiff Dickerson's phone bill receipt to fly out of his hand and land on the floor. (*Id.*). Plaintiff Dickerson did not act in a threatening manner toward Defendant Szamier or to anyone else at the store at any time. Defendant Szamier told Plaintiff Dickerson that he was "under arrest" and going to jail. (*Id.*).

Defendant Szamier used handcuffs to restrain Plaintiff Dickerson. (*Id.*). More specifically, Defendant Szamier took Plaintiff Dickerson's right hand and put it behind his back. (*Id.*). Then Defendant Szamier told Plaintiff Dickerson to give him his left hand. (*Id.*). As Plaintiff Dickerson lifted his left hand, Defendant Szamier grabbed and twisted it behind his back and closed the grip

on the handcuffs.  (*Id.*).  After handcuffing him, Defendant Szamier tugged Plaintiff Dickerson approximately four to six feet away from the BellSouth counter.  (*Id.* at 5).  Plaintiff Dickerson says he repeatedly told Defendant Szamier that the handcuffs were hurting him.[2]  (*Id.*).  As a result of the handcuffing by Defendant Szamier,  Plaintiff Dickerson suffers a severe nerve condition known as Reflex Sympathetic Dystrophy (RSD) syndrome.  (*Id.*).

Defendant City of Huntsville has implemented several policies and procedures regarding the use of force by police officers.  For example, Written Directive number 101-13 entitled "Use of Force" sets out guidelines on when an officer may use force and what type of force to use.  More specifically, the "Use of Force" policy provides:

A.    Force may be used as reasonably necessary to lawfully:

    1.    Defend oneself or others,
    2.    Overcome resistance or enforce compliance, or
    3.    Prevent Escape.

B.    Force should not be used until the Office reasonably believes that verbal commands will or have failed.

C.    Officers will exert only the degree of force necessary to effect the arrest or compliance with lawful orders; more will be considered excessive force.

D.    The "Use of Force Continuum," . . . will be the measure by which all Officers will gauge the degree of force they apply in a given situation.  If circumstances allow, Officers should apply force in escalation from minimum to maximum on the "Use of Force Continuum."

(Doc. #38 at Ex. I).

Within the "Use of Force" policy is the "Use of Force Continuum", which outlines the different levels of force applicable to varying stages of dealing with a suspect that police officers

---

[2]The court has reviewed the evidence, and all factual inferences arising from it, in the light most favorable to the nonmoving party.

face.  The "Use of Force Continuum" is divided into five stages ranging first, from the officer's appearance on the scene, to second, the officer's use of verbal commands, if the suspect does not immediately yield upon the officer's presence, to third, the use of oleoresin capsicum aerosol (OC) spray, a "soft hand" technique, or a baton, and then proceeding to the "hard hand" techniques of punching movements and handcuffing.  The forth and fifth stages involve impact weapons– police canines–and deadly force, respectively.  As noted in materials from a 1997 "Use of Force" training seminar, "while the use of reasonable physical force may be necessary in situations which cannot be otherwise controlled, force **may not** be resorted to unless all reasonable alternatives have been exhausted or would clearly be ineffective under the particular circumstances."  (Doc. #38 at Ex. S) (emphasis in original).

## III.     Analysis

### A.     Plaintiff Dickerson's Section 1983 Claims Against Defendant Szamier

As applied to individual defendants sued under § 1983, qualified immunity utilizes an "objective reasonableness standard, giving a government agent the benefit of the doubt unless [his] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them."  *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998).  The Eleventh Circuit has cautioned that, "[b]ecause qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity."  *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir.1994); *see also United States Department of State v. Ray,* 502 U.S. 164, 179 (1991) ("We generally accord . . . official conduct a presumption of legitimacy.").

4

Under the qualified immunity doctrine, government officials performing discretionary functions are immune from suit unless the alleged conduct violates "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Clearly established" rights must be "developed . . . in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this Circuit. *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

Thus, in order to receive qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks omitted). In this case, the Plaintiff contends that Defendant Szamier unlawfully arrested him, and there is no contention that Szamier did not act within his discretionary duties. If, as here, the public official establishes he was acting with discretionary authority, the burden shifts to the plaintiff to prove that qualified immunity is not warranted. *Id.* The Supreme Court has articulated a two-prong test to aid in this analysis. *Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir.2002). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Indeed, in *Saucier v. Katz*, 533 U.S. 194 (2001), the United States Supreme Court emphasized that the initial inquiry on a claim of qualified immunity is whether the police officer's conduct violated a constitutional right at all. 533 U.S. at 201. If the police officer's actions did not violate a constitutional right, "there is no necessity for further inquiries concerning qualified immunity." *Id.* Second, if a constitutional right "would

have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard,* 311 F.3d at 1347 (quoting *Saucier,* 533 U.S. at 201). Employing this standard, the court will first consider whether Defendant Szamier's conduct constituted a constitutional violation.

### 1.    Unlawful Arrest/Detention

The crux of Plaintiff Dickerson's unlawful arrest/detention claim is that he was mistakenly and improperly identified and seized by Defendant Szamier as the suspected prescription forger. In support of this claim, Plaintiff Dickerson points to the lack of similar descriptive characteristics between him and Searcy–the true suspect–not the least of which is their lack of a common name.

As it relates to Fourth Amendment constitutional rights, generally speaking, the courts have recognized three types of police-citizen encounters: (1) consensual exchanges, which do not trigger any Fourth Amendment concerns; (2) investigative detentions, which are Fourth Amendment seizures supported by a reasonable suspicion of criminal activity and limited in scope and duration; and (3) arrests, which are the most intense Fourth Amendment seizures and that are reasonable if supported by probable cause. While a reasonable investigative detention may later ripen into an arrest, "[a]n investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave." *U.S. v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995).

Therefore, as a preliminary matter in evaluating summary judgment, the court must determine what type of encounter occurred between Defendant Szamier and Plaintiff Dickerson and whether the actions taken by Defendant Szamier against Plaintiff Dickerson constitute an unlawful detention without reasonable suspicion, or alternatively, an arrest without probable cause. In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court recognized that a police officer in the field may

conduct a brief, warrantless, investigative detention of an individual if the office has a reasonable, articulable suspicion that criminal activity is taking place. *Id.* at 30.   Thus, *Terry* created an exception to the general rule that under the Fourth Amendment a seizure of a person is invalid unless justified by probable cause. *Id.*   Under *Terry*, the police officer's actions are judged by a reasonableness standard: "would the facts available to the office at the moment of seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22; *see also Courson v. McMillian*, 939 F.2d 1479, 1493 (11th Cir. 1991).

Determining whether an investigative detention took place (as opposed to an arrest) requires the court to undergo a two-part analysis: (1) whether the police officer's actions were justified by reasonable suspicion at its inception; and (2) whether the police officer's actions exceeded the permissible scope of an investigative detention, thereby ripening into an arrest. *Terry*, 392 U.S. at 20; *U.S. v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989); *Courson*, 939 F.2d at 1492.   In assessing the existence of a reasonable suspicion, the court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted); *U.S. v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995).   Moreover, the totality of the circumstances must support a finding of "specific and articulable facts which, taken together with rational inferences from those facts, reasonable warrant" the investigative detention. *Terry*, 392 U.S. at 21, *Courson*, 939 F.2d at 1493.   Furthermore, the degree of difference between the reasonable suspicion and probable cause standards is significant as "[r]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000).

Against this backdrop, the court is persuaded that Defendant Szamier is entitled to summary judgment on Plaintiff Dickerson's unlawful detention claim because (1) the undisputed facts support Defendant Szamier's reasonable suspicion that, under the totality of the circumstances, Plaintiff Dickerson was the suspect, and (2) this reasonable suspicion supported a limited detention of Plaintiff. The court further concludes that, based upon an application of the law described above to the undisputed facts, no reasonable jury could conclude otherwise.

For example, as an officer in the field, Defendant Szamier was equipped with certain descriptive characteristics of the suspect that at least closely resembled Plaintiff Dickerson. The following is a chart comparing the physical appearances of the suspect and Plaintiff Dickerson on the day in question:

| Physical Characteristics | Dispatched Description of Searcy | Appearance of Dickerson as Observed by Officer Szamier |
| --- | --- | --- |
| **Race** | White | White |
| **Sex** | Male | Male |
| **Facial Hair** | Beard | "Five Day Old Growth" or "Stubbles on his face" plus Mustache[3] |
| **Shirt** | Charcoal grey t-shirt | Grey or soiled white t-shirt[4] |

---

[3]Ex. C, Szamier Dep., pp. 96, 114-115; Ex. B, Dickerson Dep., pp. 97-98.

[4]Dickerson testified that his t-shirt was actually white. (Ex. B, Dickerson Dep., pp. 82-85). However, before he went to the drug store, he had "just got through" mowing and de-weeding his yard, which had caused him to perspire. (*Id*. at pp. 82-85, 106).

8

| Hat | Black | Black or Dark Blue[5] |
|---|---|---|
| Height | 6'2" | 6'1" to 6'2" |
| Hair | Reddish | Brown or Brown with red tint[6] |

*See* Defendant's Brief in Support of Motions for Summary Judgment (Doc. #37) at p.6.  Also, Plaintiff Dickerson was standing in a line at the back of the store, which reasonably could have been mistaken by Defendant Szamier to be the pharmacy counter.  Further, Defendant Szamier perceived that the clerk, Clarke, acknowledged him and by doing so he believed she was signaling that Plaintiff Dickerson was the suspect.

Several Eleventh Circuit opinions involving similar circumstances note that reasonable suspicion is present when the person detained resembles a description of the suspect and the suspect is seen near the site of suspicious activity shortly after the report of the crime.  *See, e.g., Blackman*, 66 F.3d 1576 (holding that law enforcement officials have reasonable suspicion to conduct brief detention of suspects located at place suggested by information, when they match description given by reliable informant); *U.S. v. Gibson*, 64 F.3d 617, 622-23 (11th Cir. 1995) (finding reasonable suspicion present when within two and a half minutes after report of crime, officers stop person matching description of suspect as black male wearing long black trench coat at bar where suspect reported to have been located); *U.S. v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983) (holding reasonable suspicion present when report received by police officer over radio of crime in progress involving tampering of vehicles at construction site coupled with description of suspects' vehicle

---

[5]Dickerson testified that his hat was actually "dark blue."  (Ex. B, Dickerson Dep., pp. 83-84).

[6]Dickerson testified that his hair was actually brown.  (Ex. B, Dickerson Dep., p. 214).

9

and officer's observation of vehicle matching description located one mile from construction site).

Moreover, the reasonable suspicion standard is not undermined simply because it is later discovered

that the officer was operating under a mistaken belief. *See Adams v. Williams*, 407 U.S. 143, 1445-

46 (1973) ("A brief detention of a suspicious individual, in order to determine his identity or to

maintain the status quo momentarily while obtaining more information, may be most reasonable in

light of the facts known to the officer at the time.").

Turning to the second prong of the investigative detention inquiry, the court must determine

whether the stop of Plaintiff Dickerson exceeded the permissible scope such that it ripened into an

arrest. No bright line rule exists for making such a determination. *Courson*, 939 F.2d at 1491;

*Hastamorir*, 881 F.2d at 1556. In *U.S. v. Sharpe*, 470 U.S. 675 (1985), the United States Supreme

Court pointed to several factors that are relevant to whether a seizure falls with the scope of an

investigative detention, including (1) the law enforcement purposes of the detention; (2) the duration

of the detention; (3) the officers' diligence in pursuing their investigation; and (4) the scope and

intrusiveness of the detention. 470 U.S. at 685-86; Courson, 949 F.2d at 1492; U.S. v. Hardy, 855

F.2d 743, 759-61 (11th Cir. 1988).

The mere utterance of the words "You are under arrest" does not automatically ripen an

investigative detention into an arrest. *See Dunaway v. New York*, 442 U.S. 200, 212-13 (1979); *see*

*also U.S. v. Diaz-Lizaraza*, 981 F.2d 1216 (11th Cir. 1993). Additionally, the use of handcuffs does

not necessarily convert a detention into an arrest. *U.S. v. Kapperman*, 764 F.2d 786, 790 n.4 (11th

Cir. 1985) ("[T]he use of a particular method to restrain a person's freedom of movement does not

necessarily make police action tantamount to an arrest."). Nor does the use of handcuffs during an

investigative detention transform it into an arrest when an officer reasonably believes that handcuffs

10

are necessary for his protection or to maintain the status quo.  *See, e.g., Hastamorir*, 881 F.2d at 1557; *Kapperman*, 764 F.2d at 790 n.4; *Blackman*, 66 F.3d at 1576.  Furthermore, courts should take account of the nature of the situation in which the detention takes place and refrain from "unrealistic second-guessing" when the police are placed in a "swiftly developing" environment.  *Sharpe*, 470 U.S. at 696.

Applying the *Sharpe* factors (and other binding precedent) to the undisputed facts regarding the detention of Plaintiff Dickerson shows that the encounter was reasonably limited in scope, intrusiveness, and duration such that it never ripened into an arrest.  Under Plaintiff Dickerson's version of the facts, the detention lasted no longer than three to four minutes.  (Ex. B, Dickerson Depo. at 89).  As the sole officer on the scene, the purpose of Defendant Szamier's detention of Plaintiff Dickerson with handcuffs was to try and secure the status quo, avoid harm to him as well as others from a potentially dangerous suspected drug offender/user, and prevent the prescription forger suspect from fleeing the drug store.  Based upon his prior law enforcement experience in handling suspected drug offenders, Defendant Szamier reasonably believed that handcuffing Plaintiff Dickerson was the safest measure to take.  (Ex. C, Szamier Dep. at 23-25, 77-78, 130, 139, 152-53); *see Terry*, 392 U.S. at 27 (noting that when determining whether officer acts reasonably under the circumstances, courts must consider "the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience.").  Defendant Szamier was diligent in his investigative efforts as he released Plaintiff Dickerson upon further questioning of witnesses and his discovery of the mistaken identity.  Thereafter, Defendant Szamier continued with his investigation and apprehended the true suspect with handcuffs.

2.      **Probable Cause**

Even if the court were persuaded that Defendant Szamier arrested (as opposed to detained) Plaintiff Dickerson, such an arrest was supported by probable cause and does not rise to the level of a Fourth Amendment constitutional violation. *See Marx v. Gumbinner*, 905 F.2d 1503, 1505-06 (11th Cir. 1990) (holding that existence of probably cause to support arrest creates absolute bar to any section 1983 action for false arrest against arresting officer). As the Supreme Court held in the criminal case of *Hill v. California*, 401 U.S. 797 (1971), "When the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Id.* at 802. The *Hill* Court further pointed out that even though the officers were mistaken, "sufficient probability, not certainty, is the touch-stone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest was a reasonable response to the situation facing them at the time. *Id.* at 804. Therefore, the reasonableness of a mistaken arrest turns upon sufficient probability (as opposed to certainty) with respect to the police arrest of the correct person. *Id.*

Also instructive on the probable cause issue is a decision of the Eleventh Circuit involving mistaken identity in the context of an arrest warrant which was entered after the filing of this case. *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002). In *Rodriguez*, the question for the court to determine was whether the officers' "**mistaken arrest** of [the plaintiff]–pursuant to the execution, in the field, of a valid **arrest** warrant for [the true suspected perpetrator]–was outside the scope of "'reasonable mistakes.'" 280 F.3d at 1347 (emphasis in original). The court studied the similarities between the plaintiff and the suspect and determined that the officers made a "reasonable mistake" when they arrested the plaintiff pursuant to the true suspect's arrest warrant. 280 F.3d 1349. The

court further granted summary judgment on the alternative basis that, "given the law at the time of arrest, the unlawfulness of the arrest was not already clearly established." *Id.*  As noted by the court:

> A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the 'preexisting law dictates, that is truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances.

*Id.* (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1030-31 (11th Cir. 2001) (en banc) (quoting *Lassiter v. Alabama A&M Univ., Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).

Application of the foregoing principles demonstrates that Defendant Szamier's actions were reasonable in light of the facts and circumstances known to him at the time as opposed to those that he later discovered.  *See U.S. v. Allison*, 953 F.2d 1346, 1349 (11th Cir. 1992); *see also McKinney v. George*, 726 F.2d 1183 (7th Cir. 1984) (holding that arrest is not unconstitutional if information relied upon by police officer later proves to be erroneous because probable cause is measured by information available at time of seizure).  While the appearances of Plaintiff Dickerson and Searcy were not exact in every respect, they did share similarities and "[a] reasonable mistake cannot . . . be transformed into an unreasonable mistake over such a small difference, given all the circumstances."  *Rodriguez*,  280 F.3d at 1347-48.

### 3.    Excessive Force

Based upon his deposition, Plaintiff Dickerson factually supports his excessive force claim by complaining that Defendant Szamier: (1) "walked up behind [him]"; (2) did not identify himself as a police office; (3) should have "acted more civilized"; (4) did not ask him to "step back from the counter"; and (5) should not have pulled him backward five or six feet. (Ex. B, Dickerson Dep. at 124-25, 180-90).  Plaintiff Dickerson further complains that as a result of this encounter, he has

suffered severe medical complications and disabilities including the loss of the use of his left hand. (Ex. B., Dickerson Dep. at 132-35, 139-41, 145-49).  These facts, taken in the light most favorable to Plaintiff Dickerson, do not rise to a Fourth Amendment constitutional violation.

As noted by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989):

> Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.

*Id.* at 396.  Additionally, the *Graham* Court cautioned that in determining what level of force is reasonable, there must be an "allowance for the fact that police officers are often forced to make split-second judgment–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  Moreover, when a police officer arrests a suspect based upon a reasonable mistake which leads to an arrest or detention, the officer is entitled to use whatever force that he would otherwise have been able to use had he been correct in the identification of the suspect.  *Hill*, 401 U.S. at 804.

As the Eleventh Circuit has held, "the application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000).  For example, "painful handcuffing, without more, is not excessive force where the injuries are minimal."  *Id.*  Moreover, beyond mere handcuffing, the Eleventh Circuit has also held that the application of minor restraining force (such as grabbing or pulling) constitutes constitutionally acceptable reasonable force.  *See, e.g., Nolin*, 207 F.3d at 1258; *Rodriguez*, 280 F.3d at 1352 (finding that arresting officer's use of force objectively reasonable when officer grabbed arrestee's arm, twisting it behind his back, jerking it up close to should, and then handcuffing suspect as he fell to ground screaming that officer had hurt him); *Vinyard v. Wilson*, 311 F.3d 1340, 1349

14

n.13 (11th Cir. 2002) (stating that use of force is *de minimis* when officer grabs arrestee by arm and

jerks her out of chair during arrest); *see also Crosby v. Monroe County* 394 F.3d 1328, 1335 (11th

Cir. 2004) (noting that in evaluating excessive force claims, severity of force used is critical inquiry

as opposed to undignified nature of placement of force).

The *de minimis* force doctrine applies in this situation notwithstanding that Plaintiff

Dickerson was misidentified.  Defendant Szamier used only a slight amount of force to handcuff and

otherwise secure Plaintiff Dickerson. The use of the handcuffs on Plaintiff Dickerson was reasonable

under the circumstances to preserve the status quo and to protect persons from danger, especially as

Defendant Szamier was the sole officer on the scene.  The court's analysis is not altered by Plaintiff

Dickerson's pre-existing medical condition that was unknown to Defendant Szamier.  As

emphasized by the Eleventh Circuit in the *Rodriguez* case,

> What would ordinarily be considered reasonable force does not become excessive
> force when the force aggravates (however severely) a pre-existing condition the
> extent of which was unknown to the officer at the time.

280 F.3d at 1353.  In *Rodriguez*, because the arrestee had suffered an earlier injury, what would

otherwise have been a common non-excessive handcuffing technique caused a severe injury.

However, because the office was unaware of the arrestee's pre-existing condition at the time of the

arrest and the amount of force used was otherwise reasonable, the Eleventh Circuit concluded that

no Fourth Amendment violation occurred.

Here, the circumstances surrounding Plaintiff Dickerson's excessive force claim are

remarkably similar to those found in the *Rodriguez* case.  Plaintiff Dickerson, like the plaintiff in

Rodriguez suffered from a prior injury such that a common non-excessive force technique may have

caused serious injury to Plaintiff Dickerson's arm.  However, in the absence of knowledge on the

part of Defendant Szamier of Plaintiff Dickerson's prior injury, Plaintiff Dickerson's injury does not convert reasonable force under the circumstances into unconstitutional excessive force.

### 4.    "Clearly Established" Law

#### a.    Unlawful Arrest/ Detention Claim

Even if a public official's conduct violates the United States Constitution, that is not the end of the inquiry.  A plaintiff must additionally demonstrate that the official violated clearly established law measured under an objective standard of which a reasonable person would have known.  *See Montoute v. Carr,* 114 F.3d 181 (11th Cir.1997); *Powell v. Georgia Department of Human Resources,* 114 F.3d 1074 (11th Cir.1997); *Pickens v. Hollowell,* 59 F.3d 1203, 1205 (11th Cir.1995); *Hartsfield v. Lemacks,* 50 F.3d 950, 953 (11th Cir.1995).  To raise a valid qualified immunity defense in this context, a police officer need only have had *arguable* probable cause to arrest the plaintiff. *Jones v. Cannon,* 174 F.3d 1271, 1283 (11th Cir.1999). Arguable probable cause means that a reasonable police officer in the defendant's position could have believed that probable cause existed. *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002).  It is the plaintiff's burden to prove the absence of arguable probable cause.  *Rankin v. Evans,* 133 F.3d 1425, 1436 (11th Cir.), *cert denied*, 525 U.S. 823 (1998).  Thus, to show that his rights have been violated, Plaintiff must prove that no reasonable police officer in the position of Pastor could have believed that there was probable cause to arrest Plaintiff.  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (internal quotation marks and citations omitted).  "As the Supreme Court has stated, [t]he qualified immunity standard gives ample room for mistaken judgments." *Gold v. City of Miami,* 121 F.3d 1442, 1446 (11th Cir. 1997), *cert denied*, 525 U.S. 870 (1998) (internal quotation marks

16

omitted) (*citing Hunter,* 502 U.S. at 229). "This accommodation exists because 'officials should not err always on the side of caution' because they fear being sued." *Gold,* 121 F.3d at 1446.

Because this case is before the court on the Defendant's Motion for Summary Judgment, the court is required to resolve all issues of material fact in favor of the Plaintiff and then answer the legal question of whether the Defendant is entitled to qualified immunity under that version of the facts. *Walker v. Briley,* 140 F.Supp.2d 1249, 1258 (N.D.Ala.2001). Therefore, viewing the factual submissions of the parties in a light most favorable to the Plaintiff, the central inquiry is whether the Defendant had arguable probable cause to arrest Plaintiff Dickerson.

On July 29, 2000, Defendant Szamier mistakenly detained (or arrested) Plaintiff Dickerson. Well after that occurred, the Eleventh Circuit recognized that it had "no precedents for what constitutes an unreasonable seizure due to a **mistaken identification** and **arrest** under a valid warrant in the field." *Rodriguez*, 280 F.3d at 1346 (emphasis in original). In addressing the clearly established law prong, the court, as an alternative holding, concluded that "given the law at the time of the arrest, the unlawfulness of the arrest was not already clearly established." 280 F.3d at 1349. The court further emphasized that:

> [B]ecause Fourth Amendment qualified-immunity determinations turn on the reasonableness of an officer's acts in a certain set of facts, the Supreme Court recently stressed that the determination of whether a legal right was already clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Id.* (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Therefore, the court concluded that assuming *arguendo* that the officers' mistaken arrest of Rodriguez was unreasonable in the constitutional sense, the officer's assertion of qualified immunity still defeated the claim because the constitutional violation was not already clearly established. 280 F.3d at 1349. While factually, this case is slightly

different because it involves a Plaintiff's assertion that there was a warrantless arrest in the field,[7] from the standpoint of a clearly established law analysis, it is identical to *Rodriguez*–Plaintiffs have cited to no binding precedent in which the court has ever held an officer under circumstances similar to this one, liable for misidentifying a detainee/arrestee in the field.[8]  *Id.* at 1349-50.

### b.    Excessive Force

Similar to Plaintiff Dickerson's unlawful arrest/detention claim, Defendant Szamier has met his burden under the qualified immunity analysis of showing that he was acting within the scope of his discretionary authority at the time of the alleged Fourth Amendment violations.  As the cases cited at pages 10-11 *supra* demonstrate, Defendant Szamier use of handcuffs on Plaintiff Dickerson was not unlawful, much less clearly unlawful under the totality of the circumstances facing him in the field.  Morever, Plaintiffs cannot satisfy their burden of citing to fact-specific case law existing prior to July 29, 2002 that can be said to give fair and clear notice to every objectively reasonable office that Defendant Szamier's conduct constituted excessive force.

### B.    Plaintiff Dickerson's Section 1983 Claims Against The City

Plaintiff Dickerson's claims under Section 1983 against the City are governed by the rules established by the United States Supreme Court in *Monell v. Department of Social Services*, 436 U.S.

---

[7]Although there was no warrant involved here, the court finds that fact to actually support Defendant Szamier's arguments in this case.  He was called to the scene of a crime in progress and did not have the luxury of time to, for example, familiarize himself with the details that a warrant could provide.

[8]For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; however, in the light of pre-existing law, the unlawfulness must be apparent. *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (internal citations and quotations omitted).

658 (1978).  In order for the City to be subjected to Section 1983 liability in this case, Monell

requires that Plaintiff Dickerson prove, at a minimum: (1) that Defendant Szamier's actions violated

the Fourth Amendment; and (2) that a "policy" or "custom" of the City caused the Fourth

Amendment violation to occur.  *See, e.g., Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.

1998) ("[A] municipality may be held liable [under section 1983] for the actions of a police officer

only when municipal 'official policy' causes a constitutional violation.").  As both of these elements

must be satisfied for *Monell* municipality liability to exist, the City's potential liability is necessarily

contingent upon the determination of the viability of Plaintiff Dickerson's claims against Defendant

Szamier.  Because the court has concluded that no underlying violation of Plaintiff Dickerson's

constitutional rights took place, there can be no municipal liability on the part of the City.  *See City

of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (recognizing that if person suffers no

constitutional injury, then no liability may exist against government body); *Rooney v. Watson*, 101

F.3d 1378, 1381 (11th Cir. 1996), *cert. denied.*, 522 U.S. 966 (recognizing that "an inquiry into a

governmental entity's custom or policy is relevant only when a constitutional deprivation has

occurred"); *Hardin v. Hayes*, 52 F.3d 934, 939 n.8 (11th Cir. 1995) (holding that when underlying

act at issue is not constitutional violation, there is no need to consider whether municipal policy is

deficient).  Accordingly, summary judgment is due to be entered in favor of the City as to Plaintiff

Dickerson's Section 1983 claims.

      **C.**    **Remaining State Law Claims**

      Having ruled that Defendants are entitled to summary judgment on all federal claims,

pursuant to 28 U.S.C. § 1367(c)(3), the court, in its discretion, declines to exercise jurisdiction over

the remaining state law claims, and will remand them for determination by the Circuit Court of

Madison County, Alabama.  28 U.S.C. § 1447(c).

## IV.     Conclusion

For the reasons stated above, the pending Motions for Summary Judgment as to the federal claims against Defendants are due to be granted.  The remaining state law claims, in the court's discretion, are due to be remanded.  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____18th_____ day of March, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

20